IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LISA ANN BYARS, et al.,

    Plaintiffs,

      v.

THE COCA-COLA COMPANY, et
al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:01-CV-3124-TWT

## ORDER

      This is an ERISA action. It is before the Court on the Coca-Cola Defendants'

Motion for Standard of Review [186] and Motion for Summary Judgment [193],

Defendants Reliastar Life Insurance Company, Kemper National Services Inc., and

NATLSCO, Inc.'s ("Reliastar's") Motion for Summary Judgment and on Standard of

Review [198], and the Plaintiff's Motion for Summary Judgment [192] and Motion

for Partial Summary Judgment on its ERISA § 502(c) Claims [195]. For the reasons

set forth below, Coca-Cola's Motion on Standard of Review is GRANTED and its

Motion for Summary Judgment is GRANTED in part and DENIED in part, Reliastar's

Motion for Summary Judgment is GRANTED, and the Plaintiff's Motion for

Summary Judgment is GRANTED in part and DENIED in part and her Motion for Partial Summary Judgment is DENIED.

## I. <u>BACKGROUND</u>

The Plaintiff, Lisa Byars, was an employee of Defendant Coca-Cola and a participant in Coca-Cola's Long Term Disability Income Plan ("the Plan"). The Plan expressly named Coca-Cola as the Plan Administrator. Coca-Cola delegated certain of its powers and duties as Plan Administrator to the Long Term Disability Committee ("the Committee"). The Plan also provided for initial claims determinations by Reliastar, the Plan's administrative services provider. In August 1999, Reliastar outsourced its responsibilities under the Plan to NATLSCO, Inc. ("NATLSCO"). Between August 1999 and December 2002, NATLSCO performed administrative services for the Plan through its subsidiary Kemper National Services Inc. ("Kemper").[1]

In 1977, the Plaintiff began working for Defendant Coca-Cola. As of August 1999, she was working as a product consultant. At that time, however, she requested a leave of absence because of injuries she sustained after falling from a horse while on vacation. As a result of this injury, the Plaintiff claimed to be suffering from pain

---

[1]For the sake of simplicity, the Court will collectively refer to Reliastar, NATLSCO, and Kemper as "Reliastar."

in her right buttock and leg, a condition which she describes as "sciatica."  She

received short term disability benefits through February 2000, the maximum six

month period, and then applied for long term disability under the Plan.  On April 14,

2000, Reliastar denied her initial claim for benefits.  The Plaintiff appealed that

decision and provided some additional medical documentation.  One of Reliastar's

reviewers, Dr. Wallquist, then performed a comprehensive review of her medical

records and concluded that there were no "quantitative objective physical findings or

diagnostics" to support her claim for long term disability benefits.  (Admin. Rec., at

CC 78-81.)  Her claim was thus again denied.

On September 22, 2000, the Plaintiff submitted her second and final appeal to

the Committee.  The Committee's representative on this claim, Barbara Gilbreath,

received the claim file from Reliastar on January 19, 2001.  On January 23, 2001, the

Committee, acting through Gilbreath, denied the Plaintiff's final appeal based on a

lack of documentation and objective clinical data to support the Plaintiff's claim that

she was continuously unable to work.

The Plaintiff then consolidated her claim with that of other Coca-Cola

employees in a class action complaint filed October 22, 2002.  Following an April 4,

2005 Order by this Court deconsolidating the case, the Plaintiff brought this action

against Coca-Cola, the Plan, the Committee, Gilbreath, and Reliastar.  She seeks

damages based on wrongful denial of benefits under ERISA § 502(a)(1)(B), failure to provide all Plan documents under § 502(c), and attorney's fees under § 502(g). <u>See</u> 29 U.S.C. § 1132. Defendant Reliastar has also filed a counterclaim for attorney's fees.

## II.  <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986).

## III. <u>DISCUSSION</u>

A. <u>Standard of Review</u>

At the outset in an ERISA action such as this one, the Court must determine the standard by which to review the administrator's decision to deny the Plaintiff's disability benefits claim.  ERISA itself does not provide a standard of review for decisions of a plan administrator or fiduciary.  In the absence of statutory guidance, the Supreme Court has established a range of standards for judicial review of benefits determinations under ERISA.  In <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989), the Supreme Court held:

> [A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

(citations and quotation marks omitted).  Consistent with <u>Firestone</u>, the Eleventh Circuit has adopted three standards for judicial review of an administrator's benefits determination: (1) *de novo* review where the plan administrator is not afforded discretion; (2) arbitrary and capricious standard when the plan grants discretion to the plan administrator; and (3) heightened arbitrary and capricious standard where there is a conflict of interest.  <u>Williams v. BellSouth Telecomms., Inc.</u>, 373 F.3d 1132, 1134 (11th Cir. 2004); <u>Paramore v. Delta Air Lines, Inc.</u>, 129 F.3d 1446, 1449-50 (11th Cir. 1997).  Here, according to the terms of the Plan, the Committee acted as Plan Administrator for Coca-Cola and had the discretion to make all final benefits

determinations. (Am. Compl., Ex. 1-A; 1-B.)  Moreover, the Plan benefits were paid

from a trust funded by Coca-Cola through irrevocable, periodic contributions.  (Am.

Compl., Ex 1-K.)  The Eleventh Circuit has repeatedly held that this type of funding

structure "eradicates any alleged conflict of interest so that the arbitrary or capricious

standard of review applies." Turner v. Delta Family-Care Disability and Survivorship

Plan, 291 F.3d 1270, 1273 (11th Cir. 2002); Buckley v. Metropolitan Life, 115 F.3d

936, 939-40 (11th Cir. 1997).

       The Plaintiff argues that although the Plan assigned discretion to the

Committee, Reliastar actually made the final decision and the Committee merely

placed a rubber stamp of approval on those determinations.  The Plaintiff thus alleges

that Defendant Reliastar acted as the de facto Plan Administrator and that, because

Reliastar was not granted discretion under the Plan, the decision to deny her benefits

should be subjected to *de novo* review.  See Hamilton v. Allen-Bradley Co., Inc., 244

F.3d 819, 824 (11th Cir. 2001) (holding that a determination as to whether a party

acted as a de facto administrator depends on whether it "had sufficient decisional

control over the claim process").  The Eleventh Circuit has made clear, however, that

"[t]he proper party defendant in an action concerning ERISA benefits is the party that

controls administration of the plan." Garren v. John Hancock Mut. Life Ins. Co., 114

F.3d 186, 187 (11th Cir. 1997).  It is inappropriate to assign liability to a party

incapable of providing the relief requested. Hunt v. Hawthorne Assocs., Inc., 119 F.3d 888, 907 (11th Cir. 1997). Here, the Plan clearly defines Coca-Cola, the employer, as the Plan Administrator and Reliastar as the administrative services provider. The Court finds no cause to reach out beyond this clear assignment and impute liability to a third party insurance company whose contractual obligations were limited to the processing of claims. Moreover, Reliastar did not have the express authority to pay the Plaintiff's benefits claim without final approval from the Committee, and thus could not provide the Plaintiff's requested remedy. For these reasons, the Court finds that "arbitrary and capricious" review of the Committee's decision to deny benefits is appropriate.

   B. Denial of Benefits Under ERISA § 502(a)(1)(B)

   The Eleventh Circuit has adopted a multi-step approach for reviewing virtually all ERISA plan benefit denials. See Williams, 373 F.3d at 1138; HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co., 240 F.3d 982 (11th Cir. 2001). In this instance, the Court must first apply a *de novo* standard of review "to determine whether the claim administrator's benefits-denial decision is 'wrong' (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision." Williams, 373 F.3d at 1138. If the Court determines, however, that the administrator's decision was wrong, it must then examine the reasonableness

of that determination under the arbitrary and capricious standard of review.  Id.
Where the Court finds that the decision is supported by reasonable grounds, the
decision is affirmed.  If not, it is reversed.

### 1. De Novo Review

The Court must first determine whether the administrator's decision was *de
novo* wrong.  "'Wrong' is the label used by our precedent to describe the conclusion
a court reaches when, after reviewing the plan documents and disputed terms *de novo*,
the court disagrees with the claims administrator's plan interpretation." HCA Health
Servs., 240 F.3d at 994 n.23.  Under ERISA, a disability claimant bears the burden of
showing that she was disabled.  Brucks v. Coca-Cola Co., 391 F. Supp. 2d 1193, 1205
(N.D. Ga. 2005) (citing Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038,
1040 (11th Cir. 1998)).  The Plaintiff must thus demonstrate that during the first 24
months of her disability she was "continuously disable[d] from performing [her]
normal duties for [her] employer." (LTD Plan, ¶ 1.11.)  After this initial 24 months,
the Plaintiff "will be considered to have a Disability if physical or mental illness or
injury continuously disables [her] from engaging in any occupation for wage or profit,
for which [she] is reasonably qualified by training, education or experience." (Id.)

According to the Job Analysis Worksheet completed by her supervisor, the
Plaintiff's job as "Product Consultant I" involved managing "support processes and

monitoring tools to enable Processing Services 24 x 7 availability of data center."

(Admin. Rec., at CC 82.)  The job required sitting six hours a day and walking one

hour a day.  It also required working with others five hours a day and working under

deadlines seven hours a day.  The Plaintiff relies on the following evidence to show

that she was disabled under the Plan's definition.

First, in an "Estimated Functional Capacities Evaluation" completed on

February 10, 2000, her physician, Dr. Payne, stated that over an eight hour workday,

she could sit for only two hours, stand for two hours, and walk for one hour.  (Id., at

CC 111.)  He further stated that, at that time, she could not work. (Id., at CC 112.)  Dr.

Payne also performed an MRI in February 2000.  He saw signs of irritation in her

sciatic nerve and again opined that she could not return to work.  (Id., at CC 100.)

The Plaintiff also presented evidence from a consulting physician, Dr. Gibbons, who

reported only that she had "sciatic nerve root tenderness" and could be suffering from

fibrosis.  (Id., at CC 73.)  He also noted that she had a "subcutaneous nodule which

feels like some fatty thickening in the right buttocks area."  (Id.)

When Dr. Payne again examined her on June 28, 2000, ten months after her

injury, her condition still had not significantly improved.  An MRI showed "a 1x 2 x

3 cm. nodule in the gluteal area, in the area of the sciatic nerve."  (Id., at CC 63.)  He

further reported that she was on various pain medications and anti-inflammatories and

had also been injected with Hydrocortisone.  According to his report, as a result of this continued pain, she had difficulty sitting for any length of time and could not squat or bend without significant pain.

The Plaintiff next points to a mental health evaluation performed by Dr. Haberman on June 20, 2000, in which he opined that she met the Plan's definition of disability.  According to Dr. Haberman, the Plaintiff had a long history of chronic depression and unhappiness that had worsened since her injury in the fall of 1999.  He found that she "objectively presented a high level of anxiety in both mood and affect and was noted to be self-negative and self-critical, indecisive."  (Id., at CC 66.)  He diagnosed her as having an Obsessive Compulsive Disorder, Social Anxiety Disorder, and Dysthemia with atypical features.  (Id., at CC 67.)  She scored a 105 on the Leibowitz Social Anxiety scale, which he found to be consistent with his diagnosis of Social Anxiety Disorder.  (Id.)  He also gave her a Global Assessment of Functioning score of 60 and opined that she had moderate impairment with "Problem Solving," "Decision Making," and "Ability to Modulate Affect."  (Id., at CC 120.)  Finally, the Plaintiff presents a letter from the Social Security Administration confirming that she has been approved for disability benefits.  (Id., at CC 88-90).[2]

---

[2]Such evidence may be considered by the court in reviewing a plan administrator's decision, but it is not determinative.  Potter v. Liberty Life Assur. Co. of Boston, 132 Fed. Appx. 253, 259 n.5 (11th Cir. 2005) (citing Paramore v. Delta Air

Against the Plaintiff's evidence of disability, the Defendants rely primarily on the conclusions of Dr. Wallquist,[3] a consulting orthopedic surgeon who opined that the Plaintiff was not disabled under the Plan's definition for several reasons. First, he found that Drs. Payne and Gibbons's initial examinations did not reveal a disability. Specifically, Dr. Payne's EMG/NCV exam in December, 1999, and MRI scans from February and June, 2000, indicated a gluteus muscle of normal signal intensity and that her lumbar spine was interpreted as normal. (Id., at CC 79.)  Dr. Wallquist interpreted Dr. Gibbons's findings as having no diagnostics or strong objective findings to support the claimant's subjective complaints.  (Id., at CC 80.)  He also pointed out that these two doctors failed to submit any additional medical documentation on appeal that provided any new quantitative evidence for reinstatement of disability benefits.

---

Lines, Inc., 129 F.3d 1446, 1452 n.5 (11th Cir.1997) and Kirwan v. Marriott Corp., 10 F.3d 784, 790 n.32 (11th Cir.1994)).

[3]Two other orthopedic surgeons also reviewed the Plaintiff's medical records and provided brief assessments.  Dr. George Crane concluded that no objective evidence supported the Plaintiff's continued disability.  (Admin. Rec., at CC 15.)  In a two sentence report, Dr. Nathan Cohen gave his exceptionally passive opinion that "I do not feel there is not enough evidence to substantiate this woman returning to some kind of gainful occupation that would only require her to do a sitting job."  (Id., at CC 99.)

Dr. Wallquist further noted that Dr. Allison Drake, another physician consulted by the Plaintiff, had expressed doubts about the legitimacy of the Plaintiff's injuries. She reported a "questionable sciatic nerve contusion. This does not follow any particular pathology." (Id., at CC 105.) She also opined that "this patient should be able to do sedentary-type of activity as long as she is able to change her position on a frequent basis." (Id., at CC 106.) On December 10, 1999, following an Electromyography(EMG)/Nerve Conduction Velocity(NCV) study,[4] Dr. Drake Reported that "[t]here is no electrodiagnostic evidence of a lumbar radiculopathy, sciatic nerve injury, peroneal mononeuropathy, peripheral neuropathy, or plexopathy" and concluded "[i]n light of the above findings, I'm still unclear as to the etiology of this patient's discomfort, but it does appear to primarily muscular." (Id., at CC 104.)

After reviewing all of the evidence, the Court finds that the Committee's decision to deny benefits to the Plaintiff during the first 24 months was wrong. The June 2000 reports from Drs. Payne and Haberman show that the combination of the Plaintiff's chronic physical pain from her injury and the aggravation of her mental

---

[4]This is used to test the nerves and muscles in the patient's entire lower extremity. A doctor will usually order this test when he suspects that there may be some type of problem with the nerve supply to the foot and leg. See Matthew Rockett, Browsing by Information on Special Testing Used for Diagnosis-Electromyography(EMG)/Nerve Conduction Velocity(NCV), http://www.podiatrynetwork.com/document_disorders.cfm?id=220.

disorder made it impossible for her to perform the normal duties of her job.  The job analysis completed by the Plaintiff's supervisor demonstrates that she was required to sit for six hours a day and work under deadlines for seven hours a day.  Dr. Payne, the only physician who actually examined the Plaintiff and completed a functionality assessment on her, stated that she could sit for no more than two hours during an eight hour workday.  In his June 28, 2000 report, he reiterated that "[i]t is now 10 months since her injury and she is still plagued with pain which requires significant limitations of her activities of daily living."  (Admin. Rec., at CC 63-64.)  The Defendants' consulting physicians have not sufficiently disputed this conclusion. Although Dr. Wallquist opined she was capable of performing her occupation, he further stated that reasonable restrictions to be placed on her "would include alternating sitting and standing positions at work."  (Id., at CC 81.)  Dr. Drake made a similar assessment.  (Id., at CC 106.)  Based on the Plaintiff's job requirements, frequent position changes would not allow her to perform the essential functions of her job.  See Seitz v. Metropolitan Life Ins. Co., 433 F.3d 647, 651 (8th Cir. 2006) ("[W]hen a Plan uses an individual's own occupation to determine whether he or she is totally disabled, being able to perform some job duties is insufficient to deny benefits.").  The Court thus concludes that the Plaintiff could not perform all the

normal duties of her job and was entitled to benefits for the first 24 months of her period of disability.

As to her LTD Benefits claim beyond the initial 24 months, however, the Court finds that she has failed to present evidence sufficient to support such a claim. Her medical records do not demonstrate that she is physically disabled from engaging in any occupation for which she is qualified. Indeed, in his final correspondence, Dr. Payne admitted that the Plaintiff was incapable only of performing any jobs that required prolonged sitting or standing. Thus, based on Dr. Payne's functional capacities evaluation, this Court finds that the Plaintiff would need to change her position approximately every hour. She has not demonstrated that there are no jobs for which she is qualified that would allow her to do so.

2. Arbitrary and Capricious Review

Because the Plan provided the Committee with discretion, the Court must next assess whether the decision to deny benefits was arbitrary and capricious. "In determining whether the denial of the [plan participant's] claims was arbitrary and capricious, 'the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made.'" Dyce v. Salaried Employees' Pension Plan of Allied Corp., 15 F.3d 163, 166 (11th Cir.1994) (citing Jett v. Blue Cross & Blue Shield of Ala., Inc.,

890 F.2d 1137, 1139 (11th Cir.1989)).  The Court is thus limited to determining whether the Committee's interpretation of the Plan was "made rationally and in good faith." Cagle v. Bruner, 112 F.3d 1510, 1518 (11th Cir. 1997).  In this case, the record demonstrates that the Committee representative assigned to the Plaintiff's claim failed to apply the correct definition of disability in reviewing Reliastar's decision.  In her January 23, 2001 denial letter, Gilbreath stated that a Plan Participant would be considered to have a disability only "if a physical or mental injury continuously disables him from engaging in any occupation for wage or profit, for which he is reasonably qualified, by training, education or experience."  (Admin. Rec., at CC 8.) This is the correct definition for "disability" only after the initial 24 month period and is thus inaccurate. It is a much more demanding definition of disability than inability to perform her own occupation.  For this reason, the Court finds that the Committee's application of the Plan to the Plaintiff's disability claim was not made rationally and in good faith.  Coca-Cola's decision is therefore reversed, and the Court orders that the Plaintiff be awarded benefits for the first 24 months of her disability.


C.  Failure to Provide Plan Documents Under ERISA § 502(c)

The Plaintiff also claims penalties against the Defendants for failure to provide her with all the requisite plan documents.  Under ERISA, the plan administrator is

required, following a request by a claimant to "furnish a copy of the latest updated summary,[sic] plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated."  29 U.S.C. § 1024(b)(4).  If the administrator either refuses or fails to comply with such requests within 30 days, § 502(c) grants a district court with the discretion to subject the administrator to fines of up to $110.00 per day.  29 U.S.C. § 1132(c)(1); 29 C.F.R. § 2575.502c-1.  In exercising this discretion, a court should consider whether a defendant's failure to provide documents was made in bad faith and whether it prejudiced a plan beneficiary.  See Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1232 (11th Cir. 2002).  This penalty is designed as a punitive damage to the violator, not as compensation for the beneficiary.  Id.; see also Daughtrey v. Honeywell, Inc., 3 F.3d 1488, 1494 (11th Cir. 1993) ("[T]he penalty range of up to $100 per day is unrelated to any injury suffered by the plan participant, suggesting that section 1132(c) is intended to punish noncompliance with the employer or administrator's disclosure obligations and not to compensate the participant.").

On March 21, 2001, the Plaintiff made an exhaustive request to Coca-Cola for all documents relevant to the Plan.  Gilbreath responded on April 24, 2001, confirming that Reliastar had already sent a copy of the Plan and the Summary Plan

Description to the Plaintiff's counsel on April 3, 2001, in response to counsel's request on behalf of another client. Coca-Cola thus concluded, quite reasonably, that the Plaintiff did not need extra copies of the Plan. (Admin. Rec., at CC 2). Gilbreath further stated that Coca-Cola had authorized Reliastar to copy the contents of the Plaintiff's claim file and mail it to her. (Id., at CC 3.) On April 27, 2001, at the request of Gilbreath, Reliastar sent to Byars' counsel a copy of the claim file. (Id., at RS 89.) Then, as part of its initial disclosure on February 14, 2002, Coca-Cola furnished the Plaintiff with an extensive list of Plan documents. On March 4, 2002, Coca-Cola's counsel wrote the Plaintiff's counsel specifically identifying the documents Coca-Cola had provided the prior month and also providing a copy of the Plan's most recent annual report.

The Plaintiff contends that she did not receive all of the requisite Plan documents, seventeen in total, until March 4, 2002. This was 318 days after the deadline set forth under § 502(c).[5] According to the Plaintiff's calculations, this results in a maximum total penalty award of $590,200.00.[6] The Plaintiff fails to

---

[5]To be in accord with § 502(c)'s 30 day requirement, these documents should have been produced by April 20, 2001.

[6]The Plaintiff's math is a little off. With a maximum penalty of $110.00 per day multiplied by 316 days (not 318 days) and again multiplied by 17 documents, the Court would arrive at this sum.

demonstrate, however, that the Defendants' failure to provide all these documents was committed in bad faith or that she was prejudiced by this failure.  She claims that because of this lack of information, she was "unaware of many aspects of the LTD Plan and prevented from making various claims administratively prior to litigation." (Pl.'s Mot. for Part. Summ. J., at 15.)  She argues first that she was prejudiced because she had no way of knowing that the Committee had cited to the wrong definition of disability in its second denial.  She further claims that when this Court dismissed her proposed class action claim in March 2004, she had no means of knowing that the Plan prevented an offset of her benefits below 60%.  According to the Plaintiff, this "forced ignorance" prevented her from being able to raise certain administrative claims prior to filing her complaint.  (Id., at 18.)  However, because the Plaintiff completed the administrative process on January 23, 2001, almost two months before she made her first request for Plan documents, any failure to respond by Coca-Cola could not have resulted in any "forced ignorance" on her part nor prevented her from being able to raise issues administratively.

Although she has shown no bad faith or prejudice, the Plaintiff asserts that "[t]he mere request for documents and the failure to produce the documents timely supports the awarding of penalties."  (Id., at 14.)  Indeed, the Plaintiff's counsel appears to be using § 502(c) principally as a means not simply to ensure receipt of all

relevant Plan documents, but as an extra sword in her arsenal of litigation tactics wielded to recover the maximum possible compensation for her client.  As stated previously, this is not the purpose of the statute.  See Scott, 295 F.3d at 1232. Furthermore, her March 21, 2001 request letter to Coca-Cola demanded every document under the sun that in any way related to Lisa Byars, including the following:

> We expect to be provided with every piece of information or physical or electronic evidence or evidence from any methods of transmission including paper, disk, tape, EDI or TYPHOON system concerning Ms. Byars claim including any information containing Ms. Byars's name or file/claim number or Social Security number or making any reference whatsoever to Ms. Byars.  Any such information should be provided regardless of your company's individual definition of "claim file."

(Admin. Rec., at CC 5.)  The Plaintiff then provided a thirteen part checklist of Plan documents to be provided by the Defendants, citing 29 C.F.R. § 2560.503-1(g) as authority for granting these requests.

The Plaintiff now claims that the Defendant's failure to promptly provide each one of these documents justifies an award of over half a million dollars.  However, this Court has previously held that failure to produce documents required under a claims regulation does not subject an administrator to statutory penalties under § 502(c).  See Brucks, 391 F. Supp. 2d at 1212.  Moreover, 29 C.F.R. § 2560.503-1 applies to ERISA § 503, not § 502.  Accordingly, because Coca-Cola had already confirmed the Plaintiff's receipt of a copy of the Plan and the Summary Plan

Description within the 30 day period and arranged for her to receive her claims file, the employer was rightfully dubious about granting the rest of the Plaintiff's counsel's requests.  As the Plaintiff was not prejudiced by any delay, the Court finds no cause to assess any penalties.  Summary Judgment for the Defendants on this claim is warranted.

      D. <u>Attorney's Fees Under ERISA § 502(g)</u>

      Both the Plaintiff and Defendant Reliastar also claim attorney's fees under 29 U.S.C. § 1132(g).  The statute authorizes this Court to award reasonable attorney's fees and costs of action to either party in an ERISA action.  The Eleventh Circuit considers the following factors in determining an award of attorney's fees:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; (5) [and] the relative merits of the parties' positions.

<u>Wright v. Hanna Steel Corp.</u>, 270 F.3d 1336, 1344 (11th Cir. 2001).  Here, these factors do not weigh in favor of an award of attorney's fees against the Defendants or against the Plaintiff.  The Court thus denies the Plaintiff's and Reliastar's motions.

IV. <u>CONCLUSION</u>

For the reasons set forth above, the Coca-Cola Defendants' Motion on Standard of Review [186] is GRANTED; their Motion for Summary Judgment [193] is GRANTED in part and DENIED in part; Reliastar's Motion for Summary Judgment [198] is GRANTED; the Plaintiff's Motion for Summary Judgment [192] is GRANTED in part and DENIED in part; and the Plaintiff's Motion for Partial Summary Judgment [195] is DENIED.  The parties have 10 days to submit a proposed final judgment.

SO ORDERED, this 28 day of August, 2006.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge